125 N.J. Super. 97 (1973)
308 A.2d 671
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF,
v.
JERSEY CENTRAL POWER & LIGHT COMPANY, A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 27, 1973.
*98 Mr. Lewis Goldshore, Deputy Attorney General, for plaintiff (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
Mr. Robert O. Brokaw for defendant.
DOHERTY, J.C.C., Temporarily Assigned.
This is an action by the State of New Jersey as plaintiff, against defendant operator of an electric power generator plant in Lacey Township, in three counts, all arising out of the same incident. The first count seeks to enforce the penalty provisions of N.J.S.A. 23:5-28, which prohibits the discharge of harmful substances into tidal water. The second count was resolved on motion during the trial, and the *99 third count seeks to recover an award at common law, as parens patriae, for damages done to wild life, e.g., menhaden fish.
The first count encompasses a summary action to recover a penalty, while the third count is one in tort which would be governed by the rules of court concerning jury trial, discovery, etc. The parties have agreed to waive these rules and have the counts tried together. Defendant moved to dismiss the third count for failure to present a claim upon which relief could be granted. Decision was reserved on this motion at trial, but the same is hereby denied.
After a consideration and weighing of all of the testimony, the court finds that plaintiff has shown the following by a preponderance of the evidence:
On January 28, 1972 Jersey Central Power and Light Company operated an atomic power plant in Lacey Township, Ocean County, New Jersey, at a location a short distance west of the westerly shore of Barnegat Bay. In connection with this operation it had created a water intake canal from the south branch of Forked River, which branch lay to the north of its plant, running from Barnegat Bay in a westerly direction past the plant. The plant drew water from this canal into its system for the purposes of (1) cooling its condensers with water pumped through them by three of its four circulating pumps, and (2) diluting the previously circulated water by discharging additional water through one of its three diluting pumps into a discharge canal into which the circulated water was also being discharged. This discharge canal had also been created by Jersey Central Power and Light Company, to run into Oyster Creek, which creek ran along the generally southerly side of the plant into Barnegat Bay. Thus, the plant took water from the south branch of Forked River on its north and pumped it into Oyster Creek on its south, both the branch of the river and the creek being connected with Barnegat Bay a short distance downstream. All three bodies of water are tidelands.
*100 On the date in question the temperature of the water in the intake canal from Forked River was under 40° F, and the temperature of the water in the outlet canal to Oyster Creek and Oyster Creek was well over 50° . This temperature difference resulted from the fact that the condensers had been heating the circulating water prior to its discharge into the outlet canal. Large numbers of menhaden fish were in the outlet canal and Oyster Creek. The plant elected to shut down its generators suddenly on this date, resulting in a cessation of the heat in its condensers, and further resulting in a precipitous drop in temperature of the water being discharged into the outlet canal by the circulating pump which still continued to operate. This lowering of the temperature to under 40° caused a so called "fish kill", or the death of approximately 500,000 menhaden in and about the outlet canal and Oyster Creek into which it emptied. The value of these fish was $935. The continuous pumping of the colder water over the next few days has not been shown to have had any further effect in new or different "fish kills" during this period.
To sustain a cause of action in the first count under N.J.S.A. 23:5-28 the State must show that defendant placed in the fresh or tidal waters of the State any "hazardous, deleterious, destructive or poisonous substance * * *." The court lacks any case law or statutory definitions of these substances. A review of the legislative history of the statute appears appropriate in this regard. State, etc. v. Union County Park Comm'n, 89 N.J. Super. 202, 219, 220 (Law Div. 1956). In the course of a public hearing held on February 26, 1968 in connection with passage of this statute, there appears the following statement by Senator Apy in behalf of Senator Beadleston, the sponsor of the bill:
The intent is not to try to define, as the statutes presently do, that coal tar or sawdust or lime or any one of these things is going to cause the contamination. Rather, the object of the legislation is to *101 say that anyone who permits any injurious substances which have effects that are detrimental to the inhabitants of the waterways shall be responsible for doing it.
This statement, read in conjunction with the form of the bill as it appeared before and after adoption on April 29, 1968, leads the court to examine the effect and not the cause in determining if cold water is a pollutant in this instance. The court finds that the introduction of cold water into an environment artificially kept warm by the power plant killed the fish. The court holds that the putative polluter must take the environment as he finds it, and what may be hazardous in one instance may not be in another, and that the introduction of the cold water from Forked River in this case into the warm water environment of Oyster Creek amounted to the introduction of a deleterious substance. The court therefore finds that defendant violated the statute and imposes a penalty of $6,000.
With respect to the third count there is no controversy betwen the parties that New Jersey accepts the so-called trust doctrine with respect to dominion and sovereignty over lands covered by tidal waters. Our Supreme Court, in Neptune City v. Avon-by-the-Sea, 61 N.J. 296, 304 (1972), has cited as a succinct statement of this doctrine the language in the case of Illinois Central R.R. Co. v. People of State of Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892):
It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states. This doctrine has been often announced by this court. * * * [146 U.S. at 435; 13 S.Ct. at 111, 36 L.Ed. at 1036]
*102 Arnold v. Mundy, 6 N.J.L. 1, 71, (Sup Ct. 1821), held that the jus publicum includes the tidal waters and fish found therein. Neptune City v. Avon-by-the-Sea, supra states:
The original purpose of the doctrine was to preserve for the use of all the public natural water resources for navigation and commerce, waterways being the principal transportation arteries of early days and for fishing, an important source of food. [61 N.J. at 304; emphasis supplied]
Wild animals, including fish, within the jurisdiction of a State, as far as they are capable of ownership, are included in the public trust. LaCoste v. Dept. of Conservation, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437 (1924); Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896).
Both sides recognize the right of the State, as parens patriae (which is to say, trustee), to injunctive relief in order to conserve the trust corpus from actions of a wrongdoer. There has been some distinction made, as argued by defendant, between the recognized right of the State to injunctive relief in those cases, and its right to recover money damages for injury to wild life because of an alleged lack of proprietary interest in the same. However, it would appear to this court unreasonable and injudicious to impose the fiduciary duties of a trustee upon the State while withholding the ability to have the corpus reimbursed for a dimunition attributable to a wrongdoer.
In regard to the damage allegedly done to the public trust, the court is not limited to any set definition of a pollutant. Rather, the court will look to the subject which is held in trust by the State and determine whether under traditional notions of damages, damage has occurred. State of Maine v. m/v Tamano, 357 F. Supp. 1097, 1101-02 (D. Me. 1973). This court has determined as a matter of fact that the death of the fish resulted from the actions of the power company. There can be little debate that the public trust has been diminished by the loss of these fish.
*103 The court agrees with the reasoning expressed by the court in Maryland v. Amerada Hess, 350 F. Supp. 1060 (D. Md. 1972):
The conclusion seems inescapable to this court, that if the State is deemed to be the trustee of the water, then, as trustee, the State must be empowered to bring suit to protect the corpus of the trust  i.e., the waters  for the beneficiaries of the trust  i.e., the public. [at 1067]
The State has not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public to a viable marine environment are protected, and to seek compensation for any dimunition in that trust corpus.
The difficult burden of proving damages, in these as in all cases, is of course on plaintiff. Although it appears generally that the environment may well have been adversely affected in many ways, as argued by plaintiff, the court cannot speculate as to the monetary value of these damages. It awards plaintiff a judgment of $935 on this count, or the market value attributed by the State's witness to the fish killed on the day in question.