[No. F009421. Fifth Dist. June 25, 1990.]

SELMA PRESSURE TREATING COMPANY, INC., et al., Cross-complainants and Appellants, v.
OSMOSE WOOD PRESERVING COMPANY OF AMERICA, INC., Cross-defendant and Respondent.

[No. F010070. Fifth Dist. June 25, 1990.]

GERALD D. PETERY et al., Petitioners, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
REICHHOLD CHEMICALS, INC., et al., Real Parties in Interest.

[No. F010710. Fifth Dist. June 25, 1990.]

GERALD D. PETERY et al., Cross-complainants and Appellants, v.
REICHOLD CHEMICALS, INC., et al., Cross-defendants and Respondents.

[Opinion certified for partial publication.†]

---

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, and IV.

COUNSEL

Bergman & Wedner, Gregory M. Bergman, Kevin D. Sheehy, Kimble, MacMichael & Upton, Sylvia H. Coyle, David Douglas Doyle, Carlton R. Ericson and Jon Wallace Upton for Cross-complainants and Appellants and for Petitioners.

Diehl, Steinheimer, Riggio, Haydel & Mordaunt, Scott Malm, Karen Denise Lee, Thomas, Snell, Jamison, Russell & Asperger, E. Robert Wright, French, Rogers, Kezelis & Kominiarek, James M. Hofert, Kirkland & Ellis, Bruce A. Featherstone, Scott R. Bauer, Philip A. Brimmer, Gibson & Gibson, John D. Gibson, Katherine O. Gibson, Parichan, Renberg, Crossman & Harvey, Stephen T. Knudsen, Rutan & Tucker, Jayne Taylor, Mark B. Frazier, Marshall M. Pearlman, Wildman, Harrold, Allen & Dixon, Robert L. Shuftan, Sedgwick, Detert, Moran & Arnold, James L. Gault, Kevin J. Dunne, Michael F. Healy and William P. Keane for Cross-defendants and Respondents and for Real Parties in Interest.

No appearance for Respondent Superior Court.

## OPINION

**ARDAIZ, J.**—The consolidated cases before us challenge the propriety of the sustaining of several demurrers of various cross-defendants to cross-complaints filed by Selma Pressure Treating Company, Inc. (SPTC), Mary Ann Schuessler and Gerald Petery and Selma Leasing Company, Inc. (SLC). The cross-complainants were, in turn, defendants in an action filed on April 30, 1985, by the State of California and Regional Water Quality Control Board (collectively, the State).

The underlying complaint stated 15 causes of action surrounding allegations that defendants improperly disposed of hazardous waste. Nine of the causes of action requested civil penalties; two requested specific injunctive relief; and the last four causes of action, including the twelfth cause of action for maintenance of a public nuisance, more generally sought both equitable and legal relief based upon the defendants' liability for the harm done on account of the alleged improper disposal.

SPTC and Schuessler filed a joint answer and a cross-complaint against their codefendants, SLC and Petery, and two corporations, Koppers Company, Inc., and Osmose Wood Preserving Company of America, Inc. The cross-complaint sought indemnity from the cross-defendants. Osmose's demurrer was sustained with leave to amend.

Cross-complainant Schuessler filed an amended complaint and Osmose demurred again. A month later, SPTC filed an amended cross-complaint, provoking yet another demurrer from Osmose. The court sustained the demurrers to the amended cross-complaints without leave to amend and dismissed the complaints as to Osmose. On October 8, 1987, Schuessler and

SPTC appealed from the dismissals. This appeal, No. F009421, represents the first of the three cases consolidated here.

Petery and SLC jointly filed a first amended cross-complaint against codefendants, Osmose, Koppers and several chemical suppliers, Reichhold Chemicals, Inc., Monsanto Company, Ventron Corporation, Seymour Chemical, Vulcan Material Company and Van Waters and Rogers, Inc.[1] The cross-complaint contained 19 causes of action including claims for equitable indemnity against all cross-defendants and direct tort and contract causes of action against various cross-defendants.

Demurrers were filed by the cross-defendants. After a hearing, the court found that provisions of the Water Code and Health and Safety Code, which provided the basis for the claims for the civil penalties in the State's underlying complaint, could not be applied retroactively to acts or conduct preceding their enactment. Demurrers to the direct causes of action were sustained with leave to amend to plead sufficient facts to justify tolling of the statute of limitations. The court took under submission the question whether all cross-defendants could be jointly and severally liable with Petery and SLC under the State's public nuisance cause of action, relating to the equitable indemnity claims against Osmose, Koppers and the chemical suppliers.

In its "Order After Hearing," the court ultimately sustained, without leave to amend, the demurrers to the causes of action for equitable indemnity against Osmose, Koppers and the chemical suppliers. A writ petition was filed on March 21, 1988, by Petery and SLC challenging the propriety of the sustaining of these demurrers. This writ petition, No. F010070, is the second of three cases here, the writ being consolidated with the Schuessler/SPTC appeal by request of the petitioning party.

Subsequently, Petery and SLC filed their second amended cross-complaint. Two new cross-defendants were added, First Interstate Bank of California and Camp, Dresser and McKee (CDM).[2] Causes of action against all cross-defendants except SPTC and Schuessler were added for public and private nuisance based upon Petery's ownership of a lot adjoining the affected land. Additional allegations were made relative to the tolling of the statute of limitations.

---

[1] The original cross-complaint was filed on May 19, 1987, and demurred to by the various cross-defendants. By stipulation Petery and SLC filed an amended cross-complaint.

[2] First Interstate apparently "took over" operation of the wood treatment facility when, in 1981, the company became financially strapped. CDM apparently was retained recently to test the groundwater under the facility. According to the pleadings, CDM withdrew the water to test it and then discharged it into Petery's neighboring land containing a vineyard.

Another round of demurrers followed, the bank joining Osmose, Koppers and the chemical suppliers. In the order after judgment issued May 31, the court overruled the demurrer of the bank; all other demurrers were sustained without leave to amend based upon a determination that the statute of limitations had run. Orders of dismissal of Osmose, Koppers and the chemical suppliers as to the cross-complaint of Petery and SLC were entered pursuant to the sustaining of the demurrers. Petery and SLC appealed, No. F010710, this appeal forming the third of the cases before us now.

On July 10, 1989, while the matter was pending in this court, we received information that the matter had been settled between the State and appellants; in return for a payment of $25,000 by appellants, the State agreed to dismiss with prejudice its entire complaint.[3] Motions to dismiss were filed.

In August of 1989, this court indicated its desire to take judicial notice of the settlement agreement; it also requested rebriefing on the issues in light of the settlement and dismissal of the State's complaint. Also, while these matters have been pending in this court, Petery and SLC have settled with several of the parties, and we have, pursuant to Petery's request, dismissed the appeals and petition for writ as to these parties. Osmose Wood Preserving Company of America, Inc., Koppers Company, Inc., Ventron Corporation, Seymour Chemical and Van Waters and Rogers, Inc., are no longer parties to the appeal and writ pursued by Petery and SLC.

## FACTS

The facts come from the various pleadings as filed by the parties.

In 1961 Petery acquired and began operating a wood treatment facility at Selma, California.[4] The premises had housed wood treating facilities since at least 1941. Petery and Mary Ann Schuessler were married at that time. In 1970 and 1971, defendant corporations SPTC and SLC were formed. Petery and Schuessler were coowners of SPTC which, after 1970, officially ran the wood treating facilities. Title to the property was put in the name of SLC; SPTC leased the premises.

---

[3] The State explained the reasons for the dismissal: the federal government, apparently pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 et seq.), has undertaken initial responsibility for the cleanup of the site.

[4] In his complaint, Petery claims he and Schuessler both operated and actively participated in the business beginning in 1961. Schuessler on the other hand would have us believe she did, and knew, little about the early operation of the facility.

Back in 1964, before incorporation, Osmose entered into both written and oral licensing agreements with Petery and Schuessler to provide wood treating chemicals. In addition, Osmose agreed to "finance, design, manufacture, assemble, install, and construct" equipment and facilities for pressure wood treating. Ultimately, two pressure wood treating cylinders were installed by Osmose. Osmose provided training and education regarding, among other things, the disposal of the wood treating chemicals. Petery claimed Osmose knew such wastes were harmful and did not inform Petery of that fact. Indeed, Osmose recommended the construction of an unlined dirt pond on the property to receive the discharge or release of waste chemicals which Petery constructed. Petery further alleged Osmose misrepresented the injurious nature of the wood treating chemicals on the environment. The business relationship with Osmose terminated toward the end of 1966.

In November of 1966 Petery signed, as owner of Selma Pressure Treating Co., a licensing agreement with Koppers. The allegations concerning Koppers are similar to those relating to Osmose, basically alleging that Koppers installed equipment and made recommendations of operating practices, including the construction of dry wells and unlined dirt ponds to receive wastes, which resulted in wood treating chemicals being deposited in the soil overlying the aquifer. Again, allegations were made that Koppers misrepresented the reaction of the wood treating chemicals in the soil and the potential for injuring the environment.

The agreement with Koppers was renewed when SPTC was incorporated. Similarly, when Petery and Schuessler divorced in 1977 and Schuessler acquired all the stock in SPTC, Schuessler signed a new agreement with Koppers. The relationship between SPTC and Koppers lasted until 1981 when SPTC ceased operating the facility.

As to the chemical suppliers, Petery and SLC allege that in addition to supplying the toxic wood treating chemicals, the companies provided assistance and advice which was followed by cross-complainants. Petery also claimed the companies knew, or should have known, of the potential health threats posed by improper use of the chemicals, and the companies failed to warn him. This failure to warn allowed the toxic chemicals to escape into the environment and contaminate the soil and aquifer.

The State was not quiet during this time. In 1972 the California Regional Water Quality Control Board, Central Valley Region (Board), issued an order entitled "Waste Discharge Requirements" for SPTC. The Board found that "Selma Pressure Treating Company discharges an estimated

four gallons per day of highly toxic wastes . . . ." SPTC was ordered that its "discharge shall not cause a pollution of ground or surface waters" or a nuisance. Further, the order provided that "[w]astes discharged into unlined sumps" etc., were limited in the amounts of certain identified chemicals.

Next, in 1978, which would be after the transfer of all the stock in SPTC to Schuessler, the Board issued another order relating to waste discharge requirements for SPTC. The Board determined the earlier requirements were no longer adequate. After identifying two particular chemicals used by the wood treating facility, the order noted the "potential exists at the site for a discharge of chemical products to permeable land surfaces. This potential includes drippings and spillage of chemicals to unpaved areas, runoff of rainwater from paved areas contaminated with the chemicals and leakage or rupture of pipelines, fittings, treatment facilities and storage tanks." The order then recited proposals by SPTC to modify its facilities in order to reduce the possibilities for discharge. The Board ordered that neither the treatment nor discharge shall cause a nuisance or pollution; the Board forbade any discharge to cause degradation of any water supply. Specifically, the company was prohibited from discharging, either directly or through runoff, into any surface water course. Discharge of wastes to areas which have hydraulic continuity with groundwater was also prohibited.

Finally, in 1981, after SPTC filed for bankruptcy, the Board issued a cleanup and abatement order. The order identified several chemicals used by SPTC and stated they were classified as hazardous. The order noted the facility had a history of disposal of wastes "to areas with hydraulic continuity with ground water." A study indicated a potential for groundwater degradation.

The 1981 order reiterated the requirements from the 1978 order, disallowing the treatment or discharge to cause a nuisance or pollution and the prohibition against causing degradation of water supplies. The order then stated: "The Dischargers have caused or permitted wood treating wastes to be discharged to permeable soils with hydraulic continuity with ground water which threatens to or has created a condition of pollution in the underlying ground water." Next, the order cited Water Code section 13304, subdivision (a), which empowers the Board to issue a cleanup and abatement order when a person violates a waste discharge order of the Board. The 1981 order then sets out several tasks to be undertaken by SPTC by specified dates. The tasks ranged from testing the premises to the identification and implementation of remedial measures to correct and prevent groundwater degradation. Many of the State's causes of action related to

SPTC's alleged failure to comply with the 1981 cleanup and abatement order.

### DISCUSSION

### I

*Whether the Trial Court Improperly Sustained the Demurrers of Cross-complainants for Equitable Indemnity Against Osmose and the Chemical Suppliers.*

SPTC and Schuessler seek to hold Osmose at least partially liable on a theory of equitable indemnity; Petery and SLC also seek equitable indemnity from the chemical suppliers. The trial court held as to the various claims for equitable indemnity that the cross-complainants had failed to state a cause of action.

A demurrer tests the sufficiency of the complaint. Here, the trial court sustained the demurrers finding the cross-complainants failed to state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10.) **(1a)** In reviewing the propriety of such an order we independently determine whether the cross-complaint shows some relief can properly be given. (*Rader Co.* v. *Stone* (1986) 178 Cal.App.3d 10, 20 [223 Cal.Rptr. 806].) We do not concern ourselves with the cross-complainants' difficulty or inability to prove the various allegations; we are concerned only with whether such allegations show entitlement to relief or the prospect for such entitlement, if properly amended.

■ Indemnity generally arises where one party must make good a loss or damage incurred by another. Parties can contract for indemnification, or the duty to indemnify can be implied from a contract. Additionally, the right to indemnification also can be found as the result of equitable considerations. ■ Equitable indemnity as now fashioned in California allows one tortfeasor to seek either full or partial indemnity from a joint tortfeasor on a comparative fault basis. (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 608 [146 Cal.Rptr. 182, 578 P.2d 899]; *Munoz* v. *Davis* (1983) 141 Cal.App.3d 420, 423-424 [190 Cal.Rptr. 400].)

As the court in *Jaffe* v. *Huxley Architecture* (1988) 200 Cal.App.3d 1188, 1191-1192 [246 Cal.Rptr. 432], noted: "Quite simply, equitable indemnification is a matter of fairness. ' "[I]n the great majority of cases . . . equity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability, rather than the imposition of

the entire loss upon one or the other tortfeasor." ' (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 495. . . .) There seems no logical reason why the application of this doctrine should turn on the relationship of the tortfeasors to each other. What is important is the relationship of the tortfeasors to the plaintiff and the interrelated nature of the harm done. [Citation.] It would be unfair to require one tortfeasor to bear a loss disproportionate to his relative culpability simply because a tortfeasor who contributed to the loss owed a duty to the plaintiff but not to the defendant."

Thus, in deciding the propriety of allowing an indemnification claim, we look for joint liability to the plaintiff or injured party by both the would-be indemnitee and indemnitor. This court explained in *Cicone* v. *URS Corp.* (1986) 183 Cal.App.3d 194, 212 [227 Cal.Rptr. 887]: "The concept of joint tortfeasors for the purpose of indemnity is explained in the [Restatement Second of Torts] as '. . . two or more persons who are liable to the same person for the same harm. *It is not necessary that they act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants.* The rule stated applies to all torts, including not only negligence but also misrepresentation, defamation, injurious falsehood, nuisance or any other basis of tort liability.' (Rest.2d Torts, § 886A, com. b, italics added.)" (See *Alisal Sanitary Dist.* v. *Kennedy* (1960) 180 Cal.App.2d 69, 79 [4 Cal.Rptr. 379] [sanitary district, liable to property owner in both nuisance and inverse condemnation, allowed to state claim for indemnity against sewer engineers].)

In *Munoz* v. *Davis, supra,* 141 Cal.App.3d 420, the victim was injured in an automobile accident, Davis allegedly being the culpable party. The victim engaged an attorney, Munoz, to prosecute a claim against Davis. Munoz failed to file the claim against Davis within the statute of limitations. The victim filed a malpractice action against Munoz; Munoz cross-complained against Davis for equitable indemnity. Davis's demurrer was sustained by the trial court and that ruling was upheld on appeal.

After discussing the history of equitable indemnity, the reviewing court stated: "[T]here can be no indemnity without liability. In other words, unless the prospective indemnitor and indemnitee are jointly and severally liable to the plaintiff there is no basis for indemnity." (141 Cal.App.3d at p. 425.) The question was then whether Davis, who presumably caused the physical injury of the victim, was jointly and severally liable for the victim's loss of action because of the malpractice of the attorney.

In sustaining the demurrer to Petery's second cause of action for equitable indemnity against Osmose the court found: "The cross-complaint

presently before the Court seeks indemnity from the cross-defendants. There is no basis for indemnity unless the cross-complainant and the cross-defendant are jointly and severally liable to the plaintiff. (*Munoz vs. Davis* (1983) 141 Cal.App.3d 420, 425.) The Court knows of no authority under which the cross-defendant can be held liable to the plaintiff for abatement of the alleged nuisance. The *Shurpin* [v. *Elmhirst* (1983) 148 Cal.App.3d 94 (195 Cal.Rptr. 737)] decision, which deals with liability for damages, does not furnish such a basis. Under the facts alleged here it is difficult to see how the Court could fashion any order directing the cross-defendant to abate the nuisance allegedly existing on property owned and controlled by parties other than the cross-complainants and cross-defendant. Thus, the Court concludes that the cross-defendant is not liable to the plaintiff for abatement of the nuisance. Because the plaintiff cannot seek damages the holding of *Shurpin* does not support the cross-complainants' claim."

It would appear the trial court below sustained the demurrer based upon the following reasoning. By statute, when the state in its representative capacity prosecutes a cause of action for a public nuisance, it is confined to seeking an abatement of the public nuisance; money damages are not available to the state. (Code Civ. Proc., § 731; *County of San Luis Obispo* v. *Abalone Alliance* (1986) 178 Cal.App.3d 848, 859-861 [223 Cal.Rptr. 846].)[5] Under *Munoz* the prospective indemnitee and indemnitor must be jointly and severally liable to the plaintiff. Therefore, the trial court's reasoning concluded that in order for the licensing companies and the chemical suppliers to be jointly and severally liable, the State must be able to pursue a

---

[5] Code of Civil Procedure section 731 provides: "An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as the same is defined in section [3479] of the Civil Code, and by the judgment in such action the nuisance may be enjoined or abated as well as damages recovered therefor. A civil action may be brought in the name of the people of the State of California to abate a public nuisance, as the same is defined in section [3480] of the Civil Code, by the district attorney of any county in which such nuisance exists, or by the city attorney of any town or city in which such nuisance exists, and each of said officers shall have concurrent right to bring such action for a public nuisance existing within a town or city, and such district attorney, or city attorney, of any county or city in which such nuisance exists must bring such action whenever directed by the board of supervisors of such county or whenever directed by the legislative authority of such town or city."

The first sentence, dealing with private property owners, allows abatement and damages. The second sentence, dealing solely with suits prosecuted by the State in its representative capacity, refers only to seeking abatement. The courts have used this different wording to limit the recovery available to the governmental plaintiff in public nuisance actions. (See also *People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater* (1981) 114 Cal.App.3d 923, 930 [171 Cal.Rptr. 85], revd. and remanded on other grounds *sub nom. California* ex rel. *Cooper* v. *Mitchell Brothers' Santa Ana Theater* (1981) 454 U.S. 90 [70 L.Ed.2d 262, 102 S.Ct. 172]; *People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc.* (1983) 33 Cal.3d 328, 333, fn. 11 [188 Cal.Rptr. 740, 656 P.2d 1170].)

nuisance cause of action against them. Since the only remedy the State can seek for the maintenance of a public nuisance is abatement, cross-defendants cannot be liable in indemnity unless they could be made to abate the nuisance. As they have no control over the polluted land, they cannot be made to abate the nuisance. Ergo, they are not liable in equitable indemnity under the State's claim for public nuisance.

Petery and Schuessler launch a multifaceted assault upon the court's conclusion. On review our task is to determine whether under *any* theory the complaining party might be able to show entitlement to relief. If we find one such theory we must reverse the judgment and remand so that the complainants might proceed. ▮▮ Because our review encompasses solely questions of law, we can entertain legal arguments not presented below. (See *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *Fenton* v. *Board of Directors* (1984) 156 Cal.App.3d 1107, 1113 [203 Cal.Rptr. 388]; *Terry* v. *Bender* (1956) 143 Cal.App.2d 198, 201 [300 P.2d 119].)

On appeal Petery points out that, though the State is limited to seeking injunctive relief in actions brought by the State in its representative capacity for maintenance of a public nuisance generally, a logical exception to this limitation exists when the State owns the adversely affected property. Then, the State, acting in its capacity as property owner, and not merely in its representative capacity, can seek damages as well as injunctive relief under the first sentence of Code of Civil Procedure section 731. (See fn. 5, *ante.*) He then asserts that as the State "owns" the waters it could seek damages for the harm resulting to the groundwater from the wood treating wastes.

Respondents argue, however, that the terms of Code of Civil Procedure section 731 limit absolutely the remedies available to the State—only abatement is available. We disagree. ▮▮ Properly viewed, the statute, and cases interpreting the statute, limit the State only when it acts in its representative capacity protecting the public interest generally. Where the State has a property interest which has been injuriously affected by a nuisance, the State can, like any property owner, seek damages.

In *County of San Luis Obispo* v. *Abalone Alliance, supra,* 178 Cal.App.3d 848, the court held county authorities could not recoup law enforcement costs under the guise of "damages" in a public nuisance action. The court, however, also quoted Prosser.

" 'The state can never sue in tort in its political or governmental capacity, although as the owner of property it may resort to the same tort actions as any individual proprietor to recover for injuries to the property or to

recover the property itself.' (Prosser & Keeton, Torts (5th ed. 1984) § 2, p. 7.)" (178 Cal.App.3d at p. 859.)

In *Abalone Alliance* and the other cases which apply strictly the second sentence of Code of Civil Procedure section 731, *People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater, supra,* 114 Cal.App.3d 923, 930, *People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc., supra,* 33 Cal.3d 328, 333, footnote 11, the governmental entity had no proprietary interest injured by the defendant's maintenance of a nuisance; the damages sought were to cover governmental costs. The government sued exclusively in its representative capacity in each case. (See *People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater, supra,* 114 Cal.App.3d at p. 930.)

Where the governmental unit owns or has a property interest which is injuriously affected by the nuisance, we perceive no reason why it should be barred from recovering money damages for the injury done to that interest, just as any other property owner could. The operative language of Code of Civil Procedure section 731, we believe, is a "person whose property is injuriously affected . . ." as opposed to an action "brought in the name of the people of the State of California . . . ."

While the term "person" is not generally interpreted to include governmental entities, it can be. In *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 276-277 [123 Cal.Rptr. 1, 537 P.2d 1250], the California Supreme Court explained the question may become one of legislative intent:

"In support of their contention that the 1935 amendment precluded prescription only by *private* persons, firms or corporations, defendants cite statements by this court that in the absence of express words to the contrary, neither the state nor its subdivisions are included within the general words of a statute. [Citations.] But this rule excludes governmental agencies from the operation of general statutory provisions only if their inclusion would result in an infringement upon sovereign governmental powers. 'Where . . . no impairment of sovereign powers would result, the reason underlying this rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only.' [Citations.] Pursuant to this principle, governmental agencies have been held subject to legislation which by its terms applies simply to any 'person.' "

We can envision no possible impairment of sovereign powers by interpreting the term "person" in Code of Civil Procedure section 731 to include

governmental units. Conversely, if a governmental property owner cannot pursue the tortfeasor for damages to its property interests, the governmental entity suffers under a disadvantage felt by no other property owner—it cannot recover for any injury to its property interest when another maintains a public nuisance. No public interest would be served by such a limitation; it merely would relieve a tortfeasor of some of the consequences of his tortious behavior where the property injuriously affected happened to be owned by a public entity. We do not think this is a logical interpretation of the law. Where a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons. (See Code Civ. Proc., § 731; Civ. Code, § 3491.)

■ Could the State claim here a sufficient property interest to support a damage claim? We answer in the affirmative.

Water Code section 102 provides: "All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law." Water Code section 12922 provides: "It is hereby declared that the people of the State have a primary interest in the correction and prevention of irreparable damage to, or impaired use of, the ground water basins of this State caused by critical conditions of overdraft, depletion, sea water intrusion or degraded water quality."

As the court in *Ivanhoe Irr. Dist.* v. *All Parties* (1957) 47 Cal.2d 597, 625 [306 P.2d 824], revd. on other grounds *sub nom. Ivanhoe Irrig. Dist.* v. *McCracken* (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174], explained: "[T]he state is not the owner of the domestic water of the state in the sense that it has absolute power and dominion over it to the exclusion of the rights of those who have the beneficial interest therein. The title is an equitable one residing in the water users of the state. The state as an entity is the holder of the legal title as trustee for the benefit of the people of the state, all of whom in the last analysis, are the water users of the state." (See also *California Trout, Inc.* v. *State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 630 [255 Cal.Rptr. 184]; *Orange County Water District* v. *City of Riverside* (1959) 173 Cal.App.2d 137, 168-169 [343 P.2d 450].) Thus, both statute and case law suggest the state has a legally cognizable property interest in the waters of the state.

In *Aerojet-General Corp.* v. *Superior Court* (1989) 211 Cal.App.3d 216 [258 Cal.Rptr. 684], the court's analysis lends credence to the notion that

the state's proprietary interest in the waters of the state support a claim for damages.

"Real parties also contend there can be no 'damages' under the policy because the government suits do not allege property damage . . . . With regard to the state and federal CERCLA complaints, real parties contend the suits are not for damages, but simply an exercise of police power . . . . With regard to the two state complaints, real parties claim there are no 'damages' involved because the state cannot sue for 'damages' as would a traditional, fee-simple-absolute property holder. Real parties assert that the concept of public ownership of water, presumably because limited to rights of use and regulation, is a '19th-century fiction.' The short answer to this contention is that real parties did not challenge the state's standing below, and should not be permitted to do so now. However, since we conclude real parties are mistaken and the issue could arise again, we resolve it here.

"In this state, all ownership of water is usufructuary; water rights decisions 'do not speak of the ownership of water, but only of the right to its use.' [Citation.] The state's property interest in groundwater, as established by Water Code section 102 . . . is no less usufructuary than that of private ownership, and public waters may be duly used, regulated and controlled in the public interest. [Citations.] The state's public trust interest in the navigable portions of the American River is similarly sufficient for standing to claim damages caused by environmental pollution. [Citation.]

"Unquestionably, the state and federal governments are third party property owners for purposes of insurance coverage. Pollution of the ground and river waters is damage to public property, as well as a direct injury to public welfare. [Citation.] Indeed, even real parties' authorities note the great weight of authority holding environmental contamination to be 'property damage.' [Citation.]" (*Aerojet-General Corp.* v. *Superior Court, supra,* 211 Cal.App.3d at pp. 229-230, fn. omitted.)

We note also a line of cases recognize and protect the State's *parens patriae* interest in the air, land and waters of its territory. (See *Georgia* v. *Pennsylvania R. Co.* (1945) 324 U.S. 439, 451 [89 L.Ed. 1051, 1059, 65 S.Ct. 716]; *Georgia* v. *Tennessee Copper Co.* (1907) 206 U.S. 230 [51 L.Ed. 1038, 27 S.Ct. 618]; *Kansas* v. *Colorado* (1907) 206 U.S. 46, 99 [51 L.Ed. 956, 975, 27 S.Ct. 655]; *Missouri* v. *Illinois* (1906) 200 U.S. 496 [50 L.Ed. 572, 26 S.Ct. 268].) Where confronted with the issue, the courts have accorded the State the right to seek money damages based upon such interest. (*Lansco, Inc.* v. *Department of Environ. Pro.* (1975) 138 N.J.Super. 275 [350 A.2d 520, 524-525]; *State of Maine* v. *M/V Tomano* (S.D.Me. 1973) 357 F.Supp.

1097, 1101; *State, Dept. of Envir. Pro.* v. *Jersey Central P. & L. Co.* (1973) 125 N.J.Super. 97 [308 A.2d 671], revd. on other grounds (1976) 69 N.J. 102 [351 A.2d 337]; *State of Maryland, Dept. of N. Res.* v. *Amerada Hess Corp.* (D.Md. 1972) 350 F.Supp. 1060, 1066-1067; see esp., *State of Hawaii* v. *Standard Oil Company of California* (D.Hawaii 1969) 301 F.Supp. 982, 984-988, revd. (9th Cir. 1970) 431 F.2d 1282, for an excellent background discussion of the doctrine.) This right of recovery is not diminished by the coexistence of express statutory remedies where the legislation does not presume to preempt common law rights. (*State, Department of Fish and Game* v. *S.S. Bournemouth* (C.D.Cal. 1969) 307 F.Supp. 922, 929 [admiralty case allowing the State of California to seek money damages for injury to its waters and wildlife therein flowing from an oil spill].)

"It has long been established that the sovereign's interest in the preservation of public resources and the environment enables it to maintain an action to prevent injury thereto. [Citations.]

"More recently the courts of this jurisdiction and elsewhere have recognized that the state has the right to obtain damages for an injury to public resources and the environment. [Citations.] . . . As was said in *Jersey Central*: 'The State has not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public to a viable marine environment are protected, and to seek compensation for any diminution in that trust corpus. [. . . 308 A.2d at 674].'" (*Lansco, Inc.* v. *Department of Environ. Pro., supra*, 350 A.2d at p. 524.)

Whether we term the State's interest here a direct usufructuary interest, a mere legal interest held for the benefit of the People or an interest supported by its *parens patriae* role, the State does have a legally cognizable interest in the groundwaters affected here which would suffice to support a claim for damages under Code of Civil Procedure section 731.

■ Finally, the pleadings below are compatible with this theory. In several paragraphs the State asserted actual degradation of the waters and also asserted the State's proprietary rights in the water. While under the 12th cause of action the pleadings mention only abatement of a public nuisance, we note the State in its general prayer for damages prayed: "For damages to the natural resources of the State of California, as determined at trial." It also sought "reimbursement to the Regional Board for the costs of sampling, investigations, and other actions taken to determine the nature and extent of contamination in and around the site, and for the costs of actions which may be taken by the Regional Board to abate the existing

contamination and prevent future contamination."[6] At least for purposes of demurrer there is enough in the record to support finding the State sought, and could have been entitled to, damages on the theory of public nuisance; we think these pleadings sufficed to raise the possibility of liability below.

Having determined, in order to evaluate the legal availability of equitable indemnity for cross-complainants, that the State could plead a cause of action for damages flowing from a nuisance against respondents, it remains to be seen whether cross-complainants plead facts, or could amend the pleadings to so state facts, showing respondents might be liable for the alleged nuisance here.[7]

A nuisance is defined as: "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance." (Civ. Code, § 3479.)

A public nuisance is defined as: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.)

No one is claiming on appeal that the pleadings failed to plead adequately facts supporting the existence of a public nuisance; neither does it seem improper to characterize a nuisance as consisting of chemical products in the soil which were affecting, and threatened to affect to a much greater degree, the quality of water near Selma. The challenge here is to the sufficiency of the allegations surrounding the respondents' assistance in, or contribution to, the creation of that nuisance.

"[A]ny person creating or assisting to create and maintain the nuisance was liable to be sued for its abatement and for damages." (*Hardin* v. *Sin*

---

[6] See Water Code section 13304, subdivisions (b) and (c), which allow the state agency to recover abatement costs; however, as indicated in the prayer, the State did not limit itself to abatement costs.

[7] Having found that the State can seek money damages for the alleged nuisance, we need not decide whether the absence of control over the offending property insulates one who creates or assists in the creation of a nuisance from liability where the only remedy sought is abatement of the nuisance. (See *Moran* v. *Pittsburgh-Des Moines Steel Co.* (3d Cir. 1948) 166 F.2d 908, 914; *City of Manchester* v. *National Gypsum Co.* (D.R.I. 1986) 637 F.Supp. 646, 656; *Town of Hooksett School Dist.* v. *W.R. Grace Co.* (D.N.H. 1984) 617 F.Supp. 126, 133.) We do not find the above cases categorically relieve manufacturers or suppliers of goods from liability for nuisance.

*Claire* (1896) 115 Cal. 460, 463 [47 P. 363]; *Shurpin* v. *Elmhirst, supra,* 148 Cal.App.3d 94, 101 [195 Cal.Rptr. 737].) We are called upon to decide whether the pleadings adequately plead, or could be amended to so plead, facts which suggest Osmose and the chemical suppliers created or assisted in the creation of the nuisance here.

We conclude the pleadings of Schuessler, SPTC and Petery all contain sufficient allegations of fact showing Osmose created or assisted in the creation of a public nuisance. Between 1964 and 1966 Osmose and appellants entered into an agreement whereby the wood treatment technique of Osmose was used at the Selma facility. Osmose installed equipment and provided technical advice, including advice concerning the disposal of the chemical waste products of its process. Osmose recommended an unlined dirt pond be created for the receipt of such waste products. Osmose knew, or should have known, such disposal practices might threaten the safety of the underlying water supply. Appellants did not know of the dangerous propensities of the waste chemicals and reasonably relied upon Osmose's expertise in following its recommendations for the disposal of wastes.[8] The pleadings also indicate that when Osmose sold wood treating chemicals to appellants, it knew of the dangerous propensities of the chemicals if improperly disposed of and failed to warn appellants of these dangerous propensities.

Osmose's alleged direct involvement in the design and installation of unsafe disposal systems, coupled with its claimed knowledge of the dangers involved in such practices, clearly could support liability based upon a finding that it created or assisted in the creation of a public nuisance. (See *Shurpin* v. *Elmhirst, supra,* 148 Cal.App.3d at pp. 100-101.)

Potential liability of the chemical companies is fixed by a different route.

Petery claims, in the sixth cause of action, that the chemical companies, along with Osmose and Koppers, were "manufacturers, designers, sellers, suppliers, transporters and distributors of inherently dangerous and ultra hazardous wood treating chemical products" and that they owed a duty to appellants "to warn of all substantial and unreasonable threats to human health and safety and the environment which would result from the foreseeable and intended use of the wood-treating chemicals"; and that they failed

---

[8] Osmose, in responding to the Schuessler and SPTC appeal, suggests that as it had no contractual relationship with Schuessler, and SPTC was not yet in existence when the alleged conduct occurred, these parties could not seek indemnification. Of course, the question here is whether Osmose was jointly or severally liable to the State for the injury, not whether Osmose breached some duty to Schuessler or SPTC.

to discharge the duty to appellants—the breach of this duty was a substantial factor in causing the damage here. Do these allegations suffice to allow the complaint to survive a demurrer? With a single addition, they do.

The California Supreme Court approved of the statement of the duty to warn in the Restatement Second of Torts: "One who supplies a product directly or through a third person 'for another to use is subject to liability to those whom the supplier should expect to use the [product] with the consent of the other . . . for physical harm caused by the use of the [product] in the manner for which and by a person for whose use it is supplied, if the supplier [¶] (a) knows or has reason to know that the [product] is or is likely to be dangerous for the use for which it is supplied, and [¶] (b) has no reason to believe that those for whose use the [product] is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.' (Rest. 2d Torts, § 388; . . .)" (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 64 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].)

■ Following this formulation, it appears appellants must be able to allege they were foreseeable users, using the chemicals in a foreseeable manner; that the chemical companies knew (or should have known) the chemicals were dangerous to the environment if deposited directly in the ground; that appellants did not know of the dangers of improper disposal; that the companies failed to warn appellants of the dangers; and, ignorant of the dangers, appellants failed to guard against ground contamination.

■ First, appellants clearly were foreseeable users; they purchased the chemicals directly. Second, it would appear that disposal of the used product, known by the supplier not to be totally "consumed" by its use, is at the very least arguably a foreseeable "use" of a product. The notion of use is not confined solely to the intended use of the product. Just as a manufacturer of a chair should foresee that someone will stand on the chair, so, too, should the manufacturer of wood treating chemicals foresee that used chemicals, or chemical waste products, will be disposed of. (See Rest.2d Torts, § 395, coms. j., k.) Generally, whether or not some use is foreseeable is a question of fact; at the very least, the issue of whether disposal of waste chemicals is a foreseeable use of such chemicals presents a question of fact. (*Moran* v. *Faberge, Inc.* (1975) 273 Md. 538 [332 A.2d 11, 15-16].)

In *Boyl* v. *California Chemical Company* (D.Ore. 1963) 221 F.Supp. 669, the court found a chemical manufacturer liable to a user of an herbicide when she suffered injury after coming in contact with the area where she

disposed of the unused portions of the chemical. The court found the manufacturer breached the duty to warn.

"So, today a manufacturer who undertakes to produce and sell to the general public a product with high risk of human harm must provide specification, instruction, and warning, so that it is reasonably safe for ordinary persons to use it, *not only* for the purposes for which it is produced and intended to be used *but also* all other necessarily incidental and attendant uses (such as storage or disposal) and to give reasonable notice and warning of after or delayed effect or latent or lingering dangers not known or reasonably to be expected by the ordinary user, but which are 'foreseeably probable' to the manufacturer with his expertise.

". . . . . . . . . . . . . . . . . . . .

". . . however, no warning or protective advice whatsoever as to disposal of the fluid or of any risk to unadvised persons from the stability or long lasting qualities or propensities and lingering risks of the liquid after returning to a dry or solid form is given, or even reasonably inferable." (221 F.Supp. at pp. 674-676.)

Third, Petery does not claim in this particular cause of action that the chemical companies knew of the dangers associated with the unguarded disposal of the chemicals. Knowledge of the danger or hazard associated with a particular use by the supplier is accepted almost universally as a necessary predicate to the duty to warn. (See *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1065-1066 [245 Cal.Rptr. 412, 751 P.2d 470]; but see *Beshada* v. *Johns-Manville Products Corp.* (1982) 90 N.J. 191 [447 A.2d 539, 33 A.L.R.4th 353].) Petery does, however, make such allegations in association with his claim in the thirteenth cause of action.

"Defendants and each of them, as manufacturers, designers, sellers, suppliers, transporters, and distributors of inherently dangerous and ultra hazardous wood-treating chemical products and associated wood-treating and pollution control equipment, knew, or should have known, of the dangers and risks inherent in the handling, transportation, utilization and disposal of wood-treating chemicals, by-products, and wastes, and, more specifically, knew, or should have known, of the substantial and unreasonable threat to human health and safety and the environment posed by wood-treating chemicals, by-products and wastes placed in direct contact with soil or dirt overlying domestic or agricultural water resources, including ground water aquifers, intruding into and contaminating such water resources." Amendment to include these allegations will suffice for pleading purposes.

Fourth, Petery disclaims knowledge of dangers inherent in improper disposal of the chemicals. The duty to warn is predicated upon the notion that the user does not know of the dangers or hazards associated with the use of the product. Here, Petery disclaimed knowledge; this should be sufficient to survive a demurrer. The mere fact that Petery uses the chemicals in a business enterprise, as opposed to being a citizen consumer, does not relieve the chemical suppliers of the duty to warn. (See *Martinez* v. *Dixie Carriers, Inc.* (5th Cir. 1976) 529 F.2d 457, 466; *Beede Waste Oil* v. *Recycling Industries, Inc.* (D.Mass. 1982) 533 F.Supp. 484.) Indeed, it can be the defendant's duty to demonstrate a user has sufficient expertise to be charged with the knowledge of risks associated with a particular product. (*Hall* v. *Ashland Oil Co.* (D.Conn. 1986) 625 F.Supp. 1515, 1521.) Additionally, a user's knowledge as to some dangers associated with a product does not relieve a supplier of the duty to warn of other dangers unknown to the user. (*Billiar* v. *Minnesota Mining and Mfg. Co.* (2d Cir. 1980) 623 F.2d 240, 245.)[9]

Further, it does not appear we need now decide what effect the 1972, 1978 and 1981 orders had upon Petery's knowledge and the chemical suppliers' duty to warn. Allegations include evidence that the operations and discharging of chemicals at the plant began at least as early as 1964. At the pleading stage, we cannot say whether or to what degree the unwarned appellants' pre-1972 conduct contributed to the harm (i.e., whether 0 percent or 90 percent of the injurious chemical disposal occurred during this period). This is a question of fact. The effect of the 1972, etc., orders on appellants' knowledge as to the dangers associated with chemical contacts with the soil is also a question of fact. If governmental knowledge and requirements were known by the chemical companies to be insufficient to guard against harm, the companies still had a duty to warn. (See *Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d at p. 65.)

Fifth, Petery alleges the companies failed to warn of the dangers involved surrounding ground contact of the chemicals. This allegation suffices for purposes of demurrer.

Sixth, Petery claims the failure to warn was a substantial factor in causing any loss or damage sustained. Respondents seek to distance any failure

---

[9] Thus, in this case it seems fair to say that just because Petery knew the chemicals were toxic, he did not necessarily know, for example, the toxins would not break down when disposed of or that the chemicals, placed in the ground, could migrate to pollute groundwater.

For example, sulfuric acid is an extremely dangerous chemical; however, when placed in the soil it breaks down and is not only not hazardous, but indeed can be efficacious as a soil amendment.

to warn from the harm caused. They claim Petery's illegal behavior of discharging hazardous wastes and of violating the waste discharge orders acted as a superseding cause of the harm.

Restatement Second of Torts, section 449 provides: "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."

The foregoing statement has been cited with approval both by this court and the California Supreme Court. (*Richardson* v. *Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269]; *Wallace* v. *Der-Ohanian* (1962) 199 Cal.App.2d 141, 144 [18 Cal.Rptr. 892].) Thus here, if we can say improper disposal or storage of the chemicals was the likely consequence of the chemical suppliers' failure to warn, the fact that such disposal or storage was "negligent, intentionally tortious, or criminal" would not relieve the suppliers of potential liability for the harm caused.

Certainly, it appears that, prior to the receipt of the waste discharge orders, any improper storage or disposal of the chemicals or treated products was one of the "hazards" which made the chemical companies' omissions negligent. The effect of the orders, and Petery's claimed violation thereof, at best appear to present questions of fact as to whether they were sufficient to relieve the chemical companies of the duty to warn or to cut off their liability based upon the notion of superseding cause.

From the foregoing we conclude Schuessler and SPTC could state claims for equitable indemnity against Osmose for Osmose's contribution or assistance in the creation of a nuisance insofar as Osmose helped design the system of chemical waste disposal used at SPTC. Similarly, Petery and SLC state facts sufficient to support a cause of action for equitable indemnity against the chemical companies; we find that, in failing to warn an unknowledgeable Petery of the hazards to the environment which they knew could flow from the improper handling and disposal of the wood treating chemicals, their failure could be found to be a substantial factor in the creation of the nuisance. Under the principles of equitable indemnity, they should be liable for their share of the harm.

Several of the respondents cite, some at length, from various federal cases assessing potential liability under CERCLA of various chemical suppliers to support their arguments of nonliability here. First, the cases cited interpret the limited federal statutory provisions relative to liability; we have no

such statute here. Second, in *Edward Hines Lumber Co.* v. *Vulcan Materials Co.* (N.D.Ill. 1988) 685 F.Supp. 651, 657, the court recognized that failure to state a claim under the CERCLA provisions would not act as a bar to seeking indemnity or contribution for CERCLA cleanup costs under applicable state law. The question before us is the availability of a state law theory which would allow appellants to pursue equitable indemnity for the state's claims, not respondents' liability under CERCLA.

■ Vulcan claims appellants cannot seek indemnity here because any money owed to the State under the complaint will be in the nature of economic loss. Respondent relies upon the principle that in tort causes of action only damages flowing from the injury of person or property are recoverable; in order to recover for economic loss, a cause of action for warranty, or the like, is necessary. (See *Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 18 [45 Cal.Rptr. 17, 403 P.2d 145], but see *Huang* v. *Garner* (1984) 157 Cal.App.3d 404, 420 [203 Cal.Rptr. 800].)

" ' "Economic" loss or harm has been defined as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property . . . ." ' ([*Alfred N. Koplin & Co.* v. *Chrysler Corp.* (1977) 49 Ill.App.3d 194 (364 N.E.2d 100, 103)], quoting, Note, *Economic Loss in Products Liability Jurisprudence* (1966) 66 Colum.L.Rev. 917, 918; see also *Star Furniture Co.* v. *Pulaski Furniture Co.* (W.Va. 1982) 297 S.E.2d 854, 859.)" (*Sacramento Regional Transit Dist.* v. *Grumman Flxible* (1984) 158 Cal.App.3d 289, 294 [204 Cal.Rptr. 736].)

Our earlier finding that the State is entitled to seek damages for injury to its property interests defeats this claim. The State's recovery would be in the nature of damages, not economic loss.

## II-IV*

. . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Many motions and requests for judicial notice were brought before this court while these matters were pending. Some have been ruled upon separately; insofar as all other remaining motions or requests are not granted,

---

*See footnote, *ante,* page 1601.

either expressly or impliedly in this opinion, they are deemed denied. Also, the petition for writ of mandate or prohibition is denied, petitioner having an adequate legal remedy by way of the subsequently filed appeal. All matters raised in the petition were considered in conjunction with the subsequent appeal.

Judgment of dismissal of Schuessler's and SPTC's claims for equitable indemnity against Osmose is reversed; in all other respects the judgment is affirmed. Judgment of dismissal of SLC and Petery's claims against Vulcan, Reichhold and Monsanto for equitable indemnity and for maintenance of a nuisance are reversed; in all other respects the judgment is affirmed. Costs to appellants.

Franson, P. J., and Martin, J., concurred.

A petition for a rehearing was denied July 24, 1990, and the petitions of appellants Selma Pressure Treating Company, Inc., et al., and respondent Osmose Wood Preserving, Inc., for review by the Supreme Court were denied September 25, 1990. Eagleson, J., Kennard, J., and Arabian, J., were of the opinion that the petitions should be granted.